UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ANTHONY CORTESE, individually and   :
on behalf of others similarly       :
situated,                           :
                                    :
        Plaintiff,                  :
                                    :      19-cv-11189 (JSR)
        -v-                         :
                                    :      OPINION AND ORDER
SKANSKA KOCH, INC. and SKANSKA      :
USA, INC.,                          :
                                    :
        Defendants.                 :
                                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Plaintiff Anthony Cortese is a crane operator and a member of

the International Union of Operating Engineers ("IUOE"), Local

825, based in New Jersey.  From April to December 2019, he was

employed by defendant Skanska Koch, Inc. on the George Washington

Bridge ("GWB") restoration project (the "Project"), a project

managed by the Port Authority of New York and New Jersey ("PA").

This dispute stems from the fact that the GWB crosses the New

York-New Jersey state line.  Union workers from both New Jersey

and New York worked on the Project, sometimes crossing the state

line.  Cortese, although a New Jersey union member, worked in New

York on nine occasions.

        The gist of Cortese's complaint is that he was paid at the

New Jersey prevailing rate rather than the New York prevailing

rate, even for the work that he performed on the New York side of

the bridge.  In contrast, employees who were members of the New York union were paid at the higher New York rate, even for work performed on the New Jersey side of the bridge.

Now before the Court are Cortese's motion for partial summary judgment, ECF No. 53, and the defendants' motion for summary judgment, ECF No. 57.  For the reasons that follow, the Court denies Cortese's motion and grants in part and denies in part the defendants' motion.

### LEGAL STANDARD

The Federal Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted).  The Court must "draw[] all reasonable inferences in favor of [the] non-movant."   Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).  If "no reasonable trier of fact could find in favor of that party," then "summary judgment is proper."  Id.

Because a summary judgment motion turns on whether factual disputes exist, the Court must consider the factual assertions

2

propounded by each party and the evidence proffered by each party to support those assertions. The Court does not, and usually could not, review the entire factual record. Instead, the moving party must identify the undisputed facts and the evidence that supports them. To that end, the Southern and Eastern Districts of New York have adopted Local Rule 56.1, which requires the moving party to provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The non-moving party must provide a correspondingly numbered counterstatement, id. R. 56.1(b), and each paragraph in the movant's statement "will be deemed to be admitted for purposes of the motion unless specifically controverted" in the counterstatement, id. R. 56.1(c). Each numbered statement or counterstatement "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Id. R. 56.1(d).

Federal Rule of Civil Procedure 56, in turn, provides that a movant for summary judgment may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," but an opposing party "may object that the material cited to support

or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1)-(2).

## BACKGROUND

The following facts are not genuinely disputed.

The GWB restoration project principally calls for the replacement of suspender ropes, the rehabilitation of main cables, and the replacement of associated sidewalks. Defendants' Statement of Undisputed Facts and Plaintiff's Responses, ECF Nos. 59 & 63 ("DSUF"), ¶¶ 2, 4.

Skanska Koch, Inc. is a full-service construction contractor. DSUF ¶ 1. On or about February 23, 2017, Skanska Koch submitted a proposal for the Project; the PA ultimately retained Skanska Koch as general contractor. Plaintiff's Statement of Undisputed Facts and Defendants' Responses, ECF Nos. 56 & 67 ("PSUF"), ¶ 1.

In connection with the PA's decision to hire Skanska Koch as general contractor, the PA and Skanska Koch executed an agreement (the "Prime Contract," Ansell Decl. Ex. B, ECF No. 54-2). PSUF ¶ 2. Paragraph 52 of the Prime Contract provides, in part, that Skanska Koch

> shall pay or provide . . . to [its] workmen, laborers
> and mechanics . . . at least the prevailing rate of wage
> and supplements for others engaged in the same trade or
> occupation in the locality in which the Work is being
> performed as determined by the Engineer. For purposes
> of this Contract, the Engineer has determined that the
> prevailing rates of wage and supplements are those
> established by the Secretary of Labor of the United
> States pursuant to the Davis-Bacon Act (40 U.S.C.A.

4

276a) for the locality in which the Work is to be
performed. . . . The provisions of this numbered clause
are inserted in this Contract for the benefit of such
workmen, laborers and mechanics as well as for the
benefit of the [PA]; and if the Contractor . . . shall
pay or provide any such workman, laborer or mechanic
less than the rates of wages and supplements above
described, such workman, laborer or mechanic shall have
a direct right of action against the Contractor . . .
for the difference between the wages and supplements
actually paid or provided and those to which he is
entitled under this clause.

Prime Contract ¶ 52; DSUF ¶ 10.  The Prime Contract defines "Work"

as

all structures, equipment, plant, labor, materials and
other facilities and all other things necessary or
proper for or incidental to performing [specified tasks,
e.g., replacement of suspender ropes and protective
sleeves, rehabilitation of main cables] and related Work
at the main span, sidewalk areas, tower areas, anchorage
bases and off-span sidewalks of the [GWB] and the
vicinity thereof in the States of New Jersey and New
York.

Prime Contract ¶ 19; DSUF ¶ 11.  And the contract provides that

"'performance of Work' and words of similar import shall mean the

furnishing of such facilities and the doing of such things."  Id.

Skanska Koch's permanent project office and yard are in New Jersey,

but the GWB spans New Jersey and New York and the Project required

work on both sides of the state line.  DSUF ¶¶ 5, 6.

New Jersey and New York union members, including members of

the IUOE, Cortese's union, performed manual trade work and operated

heavy machinery for the Project.  DSUF ¶¶ 13, 14.  Both New York-

based IUOE Local 14 and New Jersey-based IUOE Local 825 (Cortese's

local) claimed jurisdiction over the bridge for purposes of the Project. DSUF ¶ 20; PSUF ¶ 10. At the beginning of the Project, Skanska Koch met with both IUOE locals, as well as the pairs of New Jersey and New York union locals representing the Ironworkers and the Laborers. DSUF ¶ 21. Skanska Koch is bound by collective bargaining agreements ("CBAs") with both IUOE locals. DSUF ¶ 17. The CBA covering Cortese's local "govern[s] rates of pay, hours and working conditions . . . within the State of New Jersey and the five Southern Counties of New York (Delaware, Ulster, Orange, Sullivan, and Rockland)." Begg Decl. Ex. C, ECF No. 61-3, at 2. The New York side of the GWB is not located within these five New York counties. Laborers were paid the rate negotiated by their home local for all work on the Project, regardless of where they worked on the bridge. DSUF ¶ 29.

On April 8, 2019, Cortese became a W-2 employee of Skanska Koch. PSUF ¶ 9. His regular shift was Monday through Friday, 7 am to 3:30 pm, with no lunch break. PSUF ¶¶ 14-15. When dispatched to the Project, he was told he would be operating a tower crane and a rough terrain crane. PSUF ¶ 13. In fact, his work primarily consisted of operating a hoist, which did not require a crane license; nevertheless, rather than offering Cortese a lower pay rate or laying him off, Skanska Koch continued to pay him the higher rate for a crane operator. DSUF ¶ 79.

On nine occasions, all during the first two months of Cortese's employment, he worked on the New York side of the GWB, operating a Tadano GR150XL crane. PSUF ¶ 18. One of these occasions involved overtime work. PSUF ¶ 20.

On October 27, 2017, counsel for the New Jersey Ironworkers Local wrote to defendants alleging underpayment of ironworkers, apparently in connection with a state-boundary-line dispute similar to Cortese's claims in this case. DSUF ¶ 32. Three days later, Skanska Koch wrote to the PA with a proposed supplement and clarification of the Prime Contract, claiming that "the requirements of the Davis-Bacon Act do not apply to the Work under this Contract," that "it will be impractical for the Contractor, and its subcontractors, to determine the specific location of Work" performed by a particular employee at a particular time, and that

> consistent with prior practice of the [PA], for Work covered by a prevailing rate of wage, the Contractor, and its subcontractors, shall pay their workmen, laborers and mechanics the prevailing wage and supplements applicable to the union and benefit funds that the worker, laborer and/or mechanic is affiliated with during the time of his or her employment of the project, regardless of whether such Work is performed on the New York or New Jersey side of the project or any combination thereof.

Begg Decl. Ex. F, ECF No. 61-6; DSUF ¶ 33. The PA responded that

> [f]or purposes of this contract, and specifically for the trade workers classified as Ironworkers, it is understood the local unions (New York Local 40 and New Jersey [L]ocal 11) have an agreement in place for work that take[s] place on interstate bridges . . . . This union agreement shall govern for purposes of prevailing

> rate of wage. . . . The Office of Investigator General
> and Audit Department have been consulted and confirmed
> the intent of the clause and that utilizing mixed crews
> and the current agreement between the two local unions
> meets the intent of the clause and Skanska Koch Inc.
> would not be in violation of the terms of the Contract.

Begg Dec. Ex. G, ECF No. 61-7; DSUF ¶¶ 34-35. However, the parties have not identified a similar "agreement in place for work that takes place on interstate bridges" to which the IUOE locals are party.

Cortese complained to the PA that there was a pay disparity between employees of the two IUOE locals who were doing the same work, which he believed was unfair. A PA contractor texted him that "[t]he Port Authority is concerned not because there is a pay dis[p]arity but because when you work in NY you may not be getting Prevailing Wage which is what this and all Port Authority jobs are governed by regarding pay rates." PSUF ¶ 33. Although Cortese exchanged several months of text message correspondence with the PA, the parties point to no evidence indicating that the PA took any action on Cortese's complaint or expressed concerns to Skanska Koch.

Most tradespeople on the GWB were laid off in December 2019. DSUF ¶ 106. Cortese was laid off and was not thereafter rehired.

Cortese filed this suit on December 6, 2019. He filed the operative First Amended Complaint on May 4, 2020. He alleges nine causes of action. Counts One through Three claim that Cortese

received inadequate pay for the days he worked in New York, in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Count Four alleges a violation of NYLL Article 6, § 195(3) for failure to provide accurate wage statements. Counts Five through Seven allege in the alternative quantum meruit, unjust enrichment, and breach of contract, respectively. Finally, Counts Eight and Nine allege that defendants violated the NYLL and the FLSA, respectively, by retaliating against Cortese when they changed his work assignment to no longer involve the use of the crane and again when they did not rehire him after the holiday layoff.

## ANALYSIS

### I.  Preemption

Defendants move for summary judgment on all claims on the grounds that plaintiffs' claims are preempted and/or precluded by the National Labor Relations Act, 29 U.S.C. § 151, et seq. ("NLRA"), and the Labor Management Relations Act, 29 U.S.C. § 141, et seq. ("LMRA"). The Court finds that plaintiffs' claims are not preempted or precluded.

The NLRA and the LMRA create different forms of preemption. NLRA preemption is a form of conflict preemption; it answers the question, can courts (whether state or federal) hear these claims at all or are they entrusted to the exclusive jurisdiction of the National Labor Relations Board ("NLRB")? LMRA preemption is a

9

form of complete preemption; it answers the question, does federal or state law apply?  The Court will first address NLRA preemption.

A. Garmon Preemption Under the NLRA

The type of NLRA preemption on which defendants rely is "Garmon preemption," stemming from San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236 (1959), and its progeny.  In Garmon, a California state court awarded damages against picketers, "based on the assumption that the behavior of the petitioning unions constituted an unfair labor practice."  Id. at 245.  The Supreme Court held that this was not an issue for state courts, or federal courts, to decide; "the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted."  Id.

The Court held that "when it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [Section] 7 of the [NLRA], or constitute an unfair labor practice under [Section] 8, due regard for the federal enactment requires that state jurisdiction must yield."  Id. at 244.  Garmon preemption applies, and the NLRB has exclusive jurisdiction, "[w]hen an activity is arguably subject to [Section] 7 or [Section] 8 of the [NLRA]."  Id. at 245.

Here, defendants argue that the terms and conditions of Cortese's employment -- including wages -- are governed by the

10

Local 825 CBA, but the Prime Contract between Skanska Koch and the PA also sets terms and conditions relating to Cortese's employment. Thus, defendants argue that by entering into the Prime Contract, insofar as the Prime Contract supplants the CBA, they themselves arguably engaged in an unfair labor practice in violation of Section 8 of the NLRA, which generally prohibits an employer's "unilateral change of an existing term or condition of employment." Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 189-90 (1991). Therefore, they argue, Garmon preemption applies.

Cortese offers three responses. First, Cortese contends that Garmon preemption does not apply because the Prime Contract was a public entity's contract for a project, also known as a "project labor agreement," which courts have found not to be preempted. But the project labor agreement cases on which Cortese relies concern whether project labor agreements themselves are subject to Garmon preemption as impermissible government regulations, not whether a claim for breach of such a contract is preempted. E.g., Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218, 232 (1993) ("Bid Specification 13.1 is not government regulation and . . . is therefore [not] subject to . . . Garmon . . . pre-emption. . . . When the [State agency], acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very

sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them.") (internal quotation marks omitted). Here, to be sure, the PA acted as a private contractor, exemplifying market forces by setting conditions for employees working on the Project. However, defendants do not argue that the Prime Contract is a preempted government regulation; they argue that Cortese's claim for breach of that contract touches on activity (<u>i.e.</u>, Skanska Koch's unilateral agreement to supplant the terms of the CBA, without collective bargaining) that arguably violates Section 8 of the NLRA. Thus, these cases are inapposite.

Second, Cortese argues that the Prime Contract is not preempted because it sets a "minimum labor standard," analogizing to cases in which the Supreme Court found that certain state laws setting minimum benefits for workers were not preempted. <u>See</u> Pl. Opp. to Def'ts' Mot. for Summ. J., ECF No. 62 ("Pls.' Opp."), at 17 ("[T]he prevailing wage requirements set forth [in] the [Prime Contract] [are] akin to a mandated benefit law, which has repeatedly been held not to be preempted by the NLRA."). These cases are not remotely comparable to the case at bar. The Prime Contract, which governs only the Project, is nothing like a generally applicable, legislatively enacted "mandated benefit law."

Finally, Cortese argues that Garmon preemption does not apply because Cortese alleges a violation of the Prime Contract, not the CBA.  See Caterpillar Inc. v. Williams, 482 U.S. 386, 396 (1987) (noting in dicta that a plaintiff may "assert legal rights independent of th[e] [CBA], including state-law contract rights, so long as the contract relied upon is not a [CBA]") (emphasis omitted).

Defendants reply that courts considering Garmon preemption do not merely ask whether a plaintiff relies upon a contract other than a CBA; they ask whether the activities that form the subject of the plaintiff's claim are protected by Section 7 or prohibited by Section 8 of the NLRA.  And here, defendants argue that by entering into the very Prime Contract on which Cortese relies, they arguably engaged in an unfair labor practice in violation of Section 8 of the NLRA because they unilaterally set wages and working conditions for union workers without negotiation.

The Court finds, however, that the aspect of the Prime Contract at issue in this case does not even arguably constitute an unfair labor practice because it merely sets minimum standards the PA was willing to accept for employees who would later work on the Project; it does not actually set the terms and conditions of employment for any union employee.  Prime Contract, Ansell Decl. Ex. B, ECF No. 54-2, ¶ 52 ("[Skanska Koch] shall pay or provide . . . to his or their workmen, laborers and mechanics . . . at least

13

the prevailing rate of wage and supplements for others engaged in the same trade or occupation in the locality in which the Work is being performed as determined by the Engineer.") (emphasis added). Setting a floor below which the employer cannot fall, in advance, in no way prevents subsequent, full-throated bargaining between union and employer, and it is certainly not a "unilateral change of an existing term or condition of employment." Litton Fin. Printing Div., 501 U.S. at 189-90. Defendants offer no authority demonstrating that it is even arguably an unfair labor practice.

This Court recognizes that Judge Liman recently took the opposite position in Cortese v. Skanska Koch, Inc., 20-cv-1632 (LJL), 2021 WL 429971 (S.D.N.Y. Feb. 8, 2021). The case before Judge Liman was similar to the case at bar. It concerned construction on the Bayonne Bridge, which spans the New Jersey-New York state line, and it involved the same lead plaintiff and one of the two defendants in the case at bar. Judge Liman reasoned that Cortese in the other action

> s[ought] a benefit that the Construction Agreement sought to give [him] and to which [he] claim[ed] entitlement. That benefit [wa]s greater than what was provided in the CBA. But the CBA is the byproduct of processes intended to protect all employees, as a matter of congressionally-adopted national labor relations policy. That policy entrusts to the union, once it is formed, the authority to negotiate wages, hours, and working conditions, and eliminates the power of the individual employee to negotiate those terms.

14

Id. at *5. For this reason, Judge Liman granted defendants' motion to dismiss with prejudice, finding Garmon preemption applied.

This Court respectfully disagrees with Judge Liman's holding in Cortese. In this Court's view, Cortese would unreasonably expand the reach of NLRA Section 8 and would chill legitimate conduct (such as, here, an agreement to pay a prevailing minimum wage rate) that, in this Court's view, does not even arguably constitute an unfair labor practice. If the PA cannot, in advance of a project, impose a minimum wage, why should it be able to impose, say, a cap on the number of hours that an employee can consecutively work? Or a requirement that employees be adequately trained before operating dangerous equipment? All such requirements would relate to the terms and conditions of employment, setting floors below which the employer may not go, and the reasoning of Cortese would suggest that a contract imposing such limitations might arguably be an unfair labor practice. This Court believes such a result is inconsistent with both the caselaw and the policies underlying the NLRA. Accordingly, this Court finds that Skanska Koch did not even arguably engage in an unfair labor practice when it agreed to pay a minimum rate of wage to its workers on the Project.

Furthermore, the Court rejects the defendants' Garmon preemption argument for a second, independent reason. Cortese's wage claims in this case concern only his work on the New York

15

side of the bridge, but the Local 825 CBA explicitly limits its jurisdiction and does not purport to set terms and conditions for work performed outside the geographic scope of New Jersey and the five Southern Counties of New York (which do not encompass the New York side of the GWB). Thus, even if executing the Prime Contract was arguably an unfair labor practice with regard to Cortese's work in New Jersey, Garmon preemption would not reach the case at bar because Cortese seeks to recover only for his work in New York.

Cortese briefly considered and rejected this argument, holding that it was not properly raised because "it was not pleaded and a party cannot amend its complaint through a brief." Cortese, 2021 WL 429971 at *10 n.4. Unlike in the case before Judge Liman, however, here the argument is properly presented. The case at bar has reached the summary judgment stage, and on the undisputed facts before this Court, the CBA explicitly limits its own jurisdiction.

For the foregoing reasons, the Court finds that Garmon preemption does not apply.

B. LMRA Preemption

LMRA preemption presents a simpler question. Generally, suits for breach of contract or tort turn on state law. However, the LMRA establishes a field of federal common law involving labor-management relations. When parties' claims arise from a dispute over the interpretation of a CBA, the LMRA preempts state law, and federal common law governs the claims. LMRA preemption is

therefore a form of complete preemption and creates a choice-of-law question. Livadas v. Bradshaw, 512 U.S. 107, 122 (1994) (explaining that § 301 "does not preclude state courts from taking jurisdiction over cases arising from disputes over the interpretation of collective-bargaining agreements, [but] state contract law must yield to the developing federal common law, lest common terms in bargaining agreements be given different and potentially inconsistent interpretations in different jurisdictions") (emphasis added). For example, the Supreme Court held that a Wisconsin tort for breach of the duty of good faith in connection with labor negotiations was preempted because "evaluation of the tort claim [wa]s inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers Corp. v. Lueck, 471 U.S. 213 (1985).

Defendants argue that Cortese's wage claims are inextricably intertwined with consideration of the terms of his local's CBA, and thus "must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." Id. at 221 (citation omitted). Plaintiff does not attempt to argue that he could satisfy the requirements of Section 301.

However, for reasons already stated, Cortese's claims depend on interpretation of the Prime Contract, not the CBA. The Supreme Court has made it clear that "[not] every state-law suit asserting a right that relates in some way to a provision in a

17

collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301." Id. at 220. Rather, "the full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." Id. Here, as noted, the CBA does not even apply to the only labor at issue here -- Cortese's work on the New York side of the state line -- so Cortese's claims are "sufficiently independent of federal contract interpretation to avoid pre-emption." Id. at 214.

For these reasons, the Court finds that Cortese's claims are not preempted or precluded.

## II. **Breach of Contract**

The Court turns now to plaintiff's claims, beginning with Count Seven, breach of contract. Cortese argues that Skanska Koch breached the Prime Contract (to which Cortese is an intended third-party beneficiary). Skanska Koch paid Cortese the same New Jersey local rate, regardless of whether he was working on the New York side or the New Jersey side of the bridge. Cortese maintains that the Prime Contract unambiguously required that, when he worked on the New York side of the bridge, he be paid the rate Skanska Koch was paying to the New York crane operators. Cortese leans heavily on the fact that the Prime Contract requires payment of the "prevailing rate of wage and supplements," maintaining that the prevailing rate of wage on the New York side of the bridge was

18

the rate paid to members of the New York local.  In fact, he points out, two New York-based crane operators performing the same work as plaintiff were paid this wage.  PSUF ¶ 12.

The defendants respond that the Prime Contract is ambiguous, so the Court should look to the course of dealing between the contracting parties, the PA and Skanska Koch.  In particular, the defendants point to the exchange of letters between Skanska Koch and the PA following the Ironworkers union's complaint.  The PA concluded that Skanska Koch's practice of paying workers their home local rate, regardless of whether that worker crossed state lines, was consistent with the Prime Contract.  Based on this course of dealing, defendants argue that the ambiguity in the contract is resolved, there is no genuine dispute of material fact regarding the contract's meaning, and defendants are entitled to summary judgment.

This Court is persuaded by neither party.  Both sides gloss over some key language in the Prime Contract (perhaps because it suggests the possibility of a compromise position that neither wants).  The Prime Contract requires Skanska Koch to pay "at least the prevailing rate of wage and supplements for others engaged in the same trade or occupation in the locality in which the Work is being performed <u>as determined by the Engineer</u>."  Prime Contract ¶ 52; DSUF ¶ 10 (emphasis added).  The Prime Contract further provides that,

> [f]or purposes of this Contract, the Engineer has
> determined that the prevailing rates of wage and
> supplements are those established by the Secretary of
> Labor of the United States pursuant to the Davis-Bacon
> Act (40 U.S.C.A. 276a) for the locality in which the
> Work is to be performed. . . .

Id. Therefore, the contract unambiguously requires payment of at least the Davis-Bacon rate "for the locality in which the Work is to be performed," but not the union-negotiated rate.

Admittedly, Skanska Koch has never paid the Davis-Bacon rates on this project. It has always paid laborers the higher rates negotiated by the respective union locals. But that shows only that the union locals did their jobs, bargaining for better rates than the minimum rates acceptable to the PA.[1] Accordingly, the Court rejects Cortese's claim that he is entitled to the New York union rates; he is entitled to, at most, the New York Davis-Bacon rates.

There remains the question whether Skanska Koch and the PA intended that New Jersey or New York's Davis-Bacon rate would apply to Cortese's work on the New York side of the bridge. In other words, what did the PA and Skanska Koch mean when they agreed that Skanska Koch would pay at least the Davis-Bacon rates in "the locality in which the Work is to be performed"? The Court continues to believe, as it explained at the motion to dismiss

--------

[1] This further illustrates why entering into the Prime Contract was not an unfair labor practice.

20

stage, that "[t]he most natural reading of this language" is that, at any given moment, "the locality in which the Work is to be performed" is the particular geographic location where a laborer is working.  Opinion and Order, ECF No. 39, at 13.

But there are other reasonable readings.  "Work" is a defined term encompassing the tasks to be performed on and around the GWB and all the materials to be provided for those tasks.  Thus, a second reading is that "the locality in which the Work is to be performed" is, more generally, the entire locality where all of "the Work" is to be performed  -- i.e., the full span of the GWB and associated anchorages, cables, sidewalks, etc.  This interpretation of the contract is consistent with the defined term "Work," but it renders the phrase ambiguous; because "the locality" would cross state lines, there would be no single applicable Davis-Bacon rate.

A third reading of the phrase would be, for a given laborer, the geographic location where the laborer is usually working.  This is a less natural reading of the words on the page, but it is arguably consistent with customary usage in the trade because, as plaintiff concedes, "[i]n the construction industry, being 'paid the prevailing rate' is often a euphemism for being paid your 'collective bargaining agreement rate,' or 'union pay scale.'" DSUF ¶ 25.

Because there are at least three reasonable readings of this phrase, the Court finds that the contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person," even one "who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Chesapeake Energy Corp. v. Bank of N.Y. Mellon T. Co., N.A., 773 F.3d 110, 114 (2d Cir. 2014) (applying New York law).   Therefore, the Court may consider extrinsic evidence of the contracting parties' intent.

Both sides point to the correspondence between Skanska Koch and the PA regarding the New Jersey Ironworkers' complaint, which is undoubtedly informative.   As noted above, the New Jersey Ironworkers expressed concerns about their pay (apparently based upon the same geographic-boundary-line dispute raised by Cortese). In response, Skanska Koch sent a letter to the PA seeking to supplement and clarify the wage/benefits provision of the Prime Contract.   Begg Decl. Ex. E, ECF No. 61-5.   The PA responded to "provide clarification" with respect that provision.   Begg Decl. Ex. F, ECF No. 61-6.   The PA responded that the two Ironworkers locals "have an agreement in place for work that takes place on interstate bridges.   This union agreement shall govern for purposes of prevailing rate of wage."   Id.   The PA also confirmed that "the current agreement between the two local unions meets the intent of

22

the clause and Skanska Koch Inc. would not be in violation of the terms of the Contract." Id.

Although this evidence is informative, it was specific to the Ironworkers' union and the Court is missing important context. What did the two Ironworkers locals agree? Did the IUOE locals reach any similar agreement regarding interstate projects? Without knowing the answers to these questions, the Court cannot conclusively ascertain whether the PA and Skanska Koch's approach to the Ironworkers' complaint resolves the ambiguity in the contract.

For the foregoing reasons, the Court finds that the Prime Contract is ambiguous and that, even looking to extrinsic evidence, genuine disputes of material fact remain regarding the meaning of the phrase "the locality in which the Work is to be performed." However, the Prime Contract unambiguously provides that the minimum rate to be provided, in whichever "locality," is the Davis-Bacon rate, not the CBA-negotiated rate. Therefore, the Court grants partial summary judgment to the defendants on the breach of contract claim (Count Seven). At trial, Cortese may argue that he should have been paid the New York Davis-Bacon rate for time worked in New York, but not the New York union rate.

## III. **Wage Claims**

Cortese argues that the defendants violated the FLSA and the NYLL when they underpaid him for the one day he worked overtime

23

(Counts One and Two) and the eight days he worked non-overtime (Count Three) on the New York side of the bridge.

The defendants' first argument on summary judgment is that Cortese's claims for overtime pay are insufficient as a matter of law because, under the FLSA and the NYLL, "the rule for determining the regular rate of pay is to divide the wages actually paid by the hours actually worked." Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 459-60 (1948). In other words, defendants argue that even if the employer were paying a legally inadequate base rate, nonetheless as long as the employer also paid out overtime in accordance with that base rate there would be no overtime claim under the FLSA and the NYLL.

The Court closely examined this legal issue at the motion to dismiss stage and rejected defendants' argument. See Opinion and Order, ECF No. 39, at 15-17 (following the persuasive reasoning of Sobczak v. AWL Industries, Inc., 540 F. Supp. 2d 354 (E.D.N.Y. 2007)). The defendants offer no material change of law or fact to justify departure from the law of the case.

On the merits, Cortese's argument for why he was paid an insufficient base rate and, thus, insufficient overtime is predicated on the Prime Contract. Thus, Counts One through Three rise or fall with Count Seven, the breach of contract claim. For the reasons previously stated, the Court grants partial summary judgment to defendants on Counts One, Two, and Three; at trial,

Cortese may seek the New York Davis-Bacon rate, but not the New York local rate.[2]

### IV.  Quasi-Contract Claims

Cortese brings claims in the alternative for quantum meruit and unjust enrichment.  "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  Clark-Fitzpatrick Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388 (1987).  The parties do not dispute that the Prime Contract is a valid and enforceable contract to which Cortese is a valid third-party beneficiary.

The defendants argue that Cortese's quantum meruit and unjust enrichment claims are, therefore, duplicative and must be dismissed.  Cortese does not respond to this argument.  The defendants are correct, and the Court grants summary judgment to the defendants on Counts Five and Six.

### V.  Retaliation

Cortese brings retaliation claims under the FLSA and the NYLL. The FLSA prohibits an employer from "discharg[ing]" or "discriminat[ing] against" "any employee because such employee has

---

[2] The Court also grants summary judgment on Count Four, Cortese's NYLL Article VI claim for allegedly inaccurate or incomplete pay statements.  Cortese identifies no evidence relating to inaccurate or incomplete pay statements; indeed, he does not address this claim at all in his summary judgment papers.  The Court finds that he has abandoned it.

filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215. For present purposes, the elements of FLSA and NYLL retaliation claims overlap in all material respects. Both are evaluated according to the Supreme Court's burden-shifting framework in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973); see also Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 374 (2d Cir. 2000) ("It is the judge, not the jury, who must decide whether [a] plaintiff has satisfied the requirements of McDonnell Douglas's minimal version of a prima facie case.") (alteration in original).

To establish a prima facie case, the plaintiff must show "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) adverse employment action [a]ffecting the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Mullins v. City of N.Y., 626 F.3d 43, 47 (2d Cir. 2010). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant satisfies that burden of production, then the ultimate burden of persuasion rests with the plaintiff, who must show that a jury could find "both that the reason [offered by the defendant] was false, and that discrimination was the real reason" for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Starting with the first element of the prima facie case, Cortese identifies two protected activities. Beginning in April 2019, Cortese complained to the defendants and to the PA that it was unfair for him to be paid at a lower rate than members of the New York union local performing the same work. Cortese's complaints to the PA were generic, relating broadly to his rate of pay, not specifically to the work he performed on the New York side of the bridge. See Begg Decl. Exs. H, I, ECF Nos. 61-8, 61-9 (text messages). Similarly, his deposition testimony shows that his complaints to the defendants focused upon the unfairness of the situation more than on any specific alleged violation of law. At the time, Cortese appeared to believe that he should have been paid the New York local rate for all work he performed on the Project, a position he has since abandoned.

Nevertheless, to secure the FLSA and NYLL's protections against retaliation, an employee need not state his complaints with lawyerly precision. And Cortese's complaints, while overbroad, encompassed a colorable FLSA claim. As discussed above, determining whether Cortese was underpaid for his work on the New York side of the line is a difficult question of contract interpretation. If he was underpaid in violation of the Prime Contract, then he was also paid insufficient overtime, in violation of the FLSA. Therefore, Cortese's April 2019 complaint meets the low bar for establishing the first element of a prima facie case:

27

that he complained about "a colorable violation of the [FLSA]." See Castagna v. Luceno, No. 09-cv-932 CS, 2011 WL 1584593, at *12 (S.D.N.Y. Apr. 26., 2011), aff'd, 744 F.3d 254 (2d Cir. 2014). The same analysis applies to the NYLL. Cortese has therefore demonstrated that his complaints beginning in April 2019 were a protected activity. The second protected activity he identifies was his filing of this lawsuit in December 2019.

Turning to the second element of the prima facie case, Cortese must show an adverse employment action, i.e., an action that "well might have dissuaded a reasonable worker from making or supporting a charge of" FLSA and/or NYLL violations. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Cortese alleges two acts of retaliation: first, that following his complaints in and after April 2019, he was assigned beginning in June 2019 exclusively to work on a hoist in New Jersey, rather than to the crane in New York; and second, that soon after filing this suit, he was not rehired following the December 2019 holiday layoff.

With respect to the first alleged act of retaliation, the Court finds that Cortese's full-time assignment to the hoist was insufficiently material to constitute an adverse employment action. Cortese argues that the assignment decreased his opportunity to receive overtime, since overtime was only available to those working Saturday shifts on the New York crane. This allegation is disputed, but even assuming that Cortese is correct,

28

Cortese cannot demonstrate an adverse employment action. The fact is, Cortese only ever worked a Saturday overtime shift on the crane once, on June 8, 2019. Even if Cortese was correct that he lost the ability to earn Saturday overtime, he was almost never earning such overtime to begin with, so the change in his compensation was de minimis and would not have dissuaded a reasonable worker from pursuing an FLSA claim.

Even without a change in compensation, plaintiff can show an adverse employment action if he was assigned to work that was "materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 641 (2d Cir. 2000). Here, however, the change was relatively minor. From the start, Cortese was only assigned to work on the New York crane nine times; otherwise, he worked on the hoist. Assigning him to continue doing full time what he had already been doing the vast majority of the time was not a materially adverse employment action.

With respect to the second alleged act of retaliation -- Skanska Koch's failure to rehire Cortese in January 2020 following a mass holiday layoff in December 2019 -- defendants offer two arguments. First, they maintain that the failure to rehire Cortese was not an adverse employment action because the decision whom to hire was not in defendants' control. After the holiday layoff, a

Skanska Koch employee, Michael McCue, called Local 825 to request an employee to operate the hoist.  At his deposition, McCue was asked, "Do you recall whether or not the dispatcher asked why you were not calling Mr. Cortese [back to work]?" McCue Dep. Tr., Ansell Decl. Ex. D, ECF No. 54-4, at 61:4-6.  McCue testified, "He asked me about that, yes. . . . I told him I wanted only a hoist operator."  Id. at 61:7-11.  Defendants argue that because Cortese was authorized to operate the hoist, the union had the authority to send Cortese back to the Project; the decision not to do so rested with the union, not with Skanska Koch.  (The defendants speculate that the hiring hall presumed that Cortese would not want to work at a lower rate and so offered the position to someone else, but the Court disregards such speculation, which the defendants offer no admissible evidence to prove.)

Cortese argues that there is a dispute of material fact regarding whether Skanska Koch or the union decided not to send him back to the Project.  He testified that, after the holidays, the Local 825 website requested not a hoist operator but rather "a crane operator, New Jersey crane license, that could operate a large hydraulic and a small hydraulic crane and a tower crane." Cortese Dep. Tr., Ansell Decl. Ex. E, ECF No. 54-5, at 178:18-20. In evaluating the defendants' motion for summary judgment, the Court must credit Cortese's testimony regarding the website; there is, thus, a genuine dispute of material fact regarding what the

union website stated.   Nevertheless, this dispute is immaterial because it does not show that Skanska Koch affirmatively declined to rehire Cortese.

Cortese further testified that Skanska Koch, rather than the union, must have decided not to rehire him because "when [Skanska] called the union hall, they said, Can you please send [another union member named Darnell] back to operate the compressor, and they said, Send us a new guy to operate the crane." Id. 179:3-7. However, Cortese conceded that his own characterization of the conversation between Skanska Koch and the union hall was speculation.   He "never called anyone or talked to anyone at the union about why [he] [wasn't] sent back to Skanska" and "never spoke to anybody at Skanska about why [he] didn't return to Skanska."   Id. 185:11-18.   Such speculation "would [not] be admissible in evidence."   Fed. R. Civ. P. 56(c)(2), so the Court disregards it.   Therefore, Cortese has not shown a genuine dispute of material fact regarding whether Skanska Koch specifically told the union hall not to send Cortese back to the Project.   Cortese has not demonstrated an adverse employment action, and the defendants are entitled to summary judgment.

Moreover, even assuming arguendo that Cortese has demonstrated an adverse employment action (in which case Cortese could make out a prima facie case for retaliation given the temporal proximity between the filing of this lawsuit and the

31

failure to rehire him), defendants argue that it was reasonable to request someone without a crane license, and no jury could reasonably infer that this decision was pretextual.  The Court agrees.

It is undisputed that for months before the layoff, Cortese had operated only the hoist, not the crane.  Someone with a crane license can command a higher wage under the CBA.  Thus, requesting only a hoist operator, rather than a crane operator, made obvious economic sense.  Cortese offers no plausible argument for why hiring a hoist operator instead of a crane operator was pretextual.

For these reasons, the Court finds that, even construing the evidence in the light most favorable to Cortese and drawing all reasonable inferences in his favor, no reasonable factfinder could conclude that Cortese has demonstrated retaliation in violation of the FLSA or the NYLL.  Accordingly, the Court grants summary judgment to the defendants on Counts Eight and Nine.

## VI.   Liability of Defendant Skanska USA

Finally, defendant Skanska USA moves for summary judgment, arguing that Skanska Koch, not Skanska USA, employed Cortese, and that Cortese has adduced no evidence that the two defendants were a "single employer" or "integrated enterprise," as required to hold Skanska USA liable under the FLSA and the NYLL.

Cortese urges the Court to apply the four-factor standard articulated by Judge Nathan in a similar case.  Under that

standard, to determine whether defendants operate as a single integrated enterprise, "courts consider: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Juarez v. 449 Rest., Inc., 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014). Skanska USA does not take issue with these four factors, but it also points out the overarching requirement that the defendants be joint employers as a matter of "economic reality." Irizarry v. Catsimatidis, 722 F.3d 99, 104-105 (2d Cir. 2013).

To demonstrate the defendants' interrelatedness, Cortese cites the following evidence. A Skanska USA press release identified Skanska Koch as "a division of Skanska USA Civil." PSUF ¶ 35. A Skanska USA website identified "Skanska" as having entered into an agreement with the PA for the Project. PSUF ¶ 36. A Skanska USA Facebook post indicated that the Project was being performed by "[o]ur New York team." PSUF ¶ 37. And a Skanska USA website identified Skanska Koch as a subsidiary office. PSUF ¶ 34.

A reasonable factfinder could infer from this evidence the first factor noted above, "interrelation of operations." However, from this scant evidence, a reasonable factfinder could not find that the defendants shared centralized control of labor relations, common management, or common ownership or financial control. At this stage, Cortese must cite more detailed evidence from which a reasonable factfinder could understand the corporate relationship

33

between the two defendants -- evidence regarding such things as mutual ownership, overlapping reporting lines, or shared management. Cortese offers no such evidence.

Because Cortese has failed to adduce substantive evidence from which a jury could reasonably conclude that the defendants are a single employer or integrated enterprise as a matter of economic reality, the Court grants summary judgment to Skanska USA on all claims.

For the foregoing reasons, the Court denies plaintiff's motion for partial summary judgment, ECF No. 53, and grants in part and denies in part defendants' motion for summary judgment, ECF No. 57, as follows:

- The Court grants summary judgment to Skanska USA, Inc. on all claims.

- The Court grants summary judgment to Skanska Koch, Inc. on Counts Four, Five, Six, Eight, and Nine.

- The Court grants partial summary judgment to Skanska Koch, Inc. on Counts One, Two, Three, and Seven. These claims will proceed to trial, but Cortese may seek only the New York Davis-Bacon rates, not the New York union-negotiated rates, for his work performed in New York.

Because criminal jury trials must be prioritized during the COVID-19 pandemic, the earliest the Court can set this case for trial will be October 2021. That said, the Court intends to try the case by the end of the year. The parties should meet and

confer and jointly call Chambers by no later than August 6, 2021 to set a trial date during the fourth quarter.

    SO ORDERED.

Dated:    New York, NY
        June 17, 2021

                                 JED S. RAKOFF, U.S.D.J.